John Davis, *et al. vs.* John H. Barney.—*June*, 1830.

The plaintiff and defendant being joint owners of a line of stages, agreed as follows : " I (the defendant) Lereby acknowledge to have received of D. (the plaintiff) stage proprietor on the W. and B. road, $9000, as a full compensa-tion for the within named four teams, and two coaches ; and I bind myself to withdraw all my pretensions to any part of said road ; and I herewith deliver to the said D. the teams as they are at this instant, on the road be-tween this place, (B.) and W. ; and further pledge myself not to be concern-ed, *direct or indirect*, in any line of stages in opposition to him." HELD, that in construing this contract, the Court must endeavor to arrive at the meaning of the parties, by looking to the motives that led to it, and the object intend-ed to be effected by it. The motive was to become sole proprietor of all the stages on that road, and to shut out all opposition. To effect that object, the purchase of the defendant's interest in the stages was made.

The intention of the contract was that the defendant should, in good faith, not only *not* become *interested* in any opposition, but that he would *not* in any manner aid or become instrumental in the setting up, or carrying on an op-position line.

The word " *indirect*" was used for the special purpose of guarding against any kind of interference by the defendant, in aiding, or in any manner promot-ing the establishment of, or carrying on, any opposition.

A line of stages being established in opposition to the plaintiff's line, the Court held, that if the defendant furnished its owners with money, credit, or other means, for the purpose of enabling them to carry it on, and that the means so furnished, did enable them to establish and carry it on, and that they could not have established or carried it on without such means, or that the defendant did furnish them with money, credit, horses, or any other means, for the purpose of enabling them the *better* to establish or carry it on, and that such means did so enable them, then the plaintiff was entitled to recover damages for a breach of the said contract.

When there is any legal admissible evidence, *tending to prove* the issue in a cause, the effect of that evidence is solely for the consideration of the Jury.

When there is no evidence applicable to the issue, or tending to prove any material fact, there is a total failure of evidence, the Court will direct the Jury accordingly.

APPEAL from *Baltimore* County Court.

This was an action upon the case, brought upon the 26th of January, 1826, by the appellants, *John Davis* and others, constituting the firm of *David Barnum & Co.* against *John H. Barney*, the appellee. The declaration contained three counts.

The *first* averred that whereas the said defendant, before and at the time of making the agreement and undertaking hereinafter next mentioned, was the owner and proprietor of certain teams and coaches, for the carriage and convey ance of passengers from *Baltimore* city, in the county aforesaid, to *Washington* and *Georgetown*, in the *District of Columbia*, and also from *Washington* and *Georgetown* aforesaid, to the said city of *Baltimore;* and being owner and proprietor, as aforesaid, the said defendant, on the 30th September, 1825, at, &c. in consideration that the said plaintiffs had paid to him the sum of $9000, as a full compensation for his four teams, (say sixteen horses) and two coaches, then running on the road between *Baltimore* city and *Washington* aforesaid, did promise and undertake, to withdraw all his pretensions to any part of the said road, and not to be concerned, direct or indirect, in any line of stages in opposition to those then owned and employed by the said plaintiffs; yet the said defendant, not regarding his said promise and undertaking, but intending to deceive and defraud the said plaintiffs in this behalf, did, afterwards, to wit, on, &c. at, &c. became sole owner of a line of stages, which were for a long space of time, to wit, &c. used and employed by the said defendant, on the said road, between the said city of *B.* and *W.* and *G*, to wit. &c. in the carriage and conveyance of passengers, in opposition to the line of stages then and there owned by the said plaintiffs, and employed and used by them on the said road as aforesaid.

*2d Count.*—And whereas also, heretofore, to wit, &c. at, &c. in consideration that the said plaintiffs had paid to the said defendant, the sum of $9000, as a full compensation for his four teams, (say sixteen horses) and two coaches, then

running on the *W.* and *B.* road, he, the said defendant, did then and there promise and undertake, to withdraw all his pretension to any part of the said road, and not to be concerned, direct or indirect, in any line of stages in opposition to them, the said plaintiffs. Yet the said *defendant,* not regarding his said last mentioned promise and undertaking, but contriving, &c. did afterwards, to wit, on, &c. at, &c. become part owner of a line of stages, which were, for a long space of time, to wit, &c. used and employed by the said defendant, on the said road, in the carriage and conveyance of passengers, in opposition to the line of stages owned by the plaintiffs and employed and used by them on the said road.

*3d Count.*—And whereas also, heretofore, to wit, on, &c. at, &c. in consideration that the said plaintiffs had paid to the said defendants, the sum of $9000, the said defendant then and there promised and undertook to withdraw all his pretensions to any part of the said road, and to deliver to the said plaintiff four teams and two coaches, as they then were upon the said road from *B.* to *W.*, and did further promise and undertake, not to be concerned, direct or indirect, in any line of stages in opposition to the said plaintiffs. Yet the said defendants, not regarding, &c. but contriving, &c. did afterwards, to wit, on, &c. at, &c. become concerned, indirectly, in establishing and carrying on a line of stages, which were for a long space of time, to wit, &c. used and employed on the said road, in the carriage and transportation of passengers, in opposition to the line of stages owned by the said plaintiffs, and used and employed by them on the said road as aforesaid, during the time of such opposition as aforesaid, to the damage, &c.

The defendant pleaded *non assumpsit,* and issued was joined.

*1st Exception.*—At the trial of this case, the plaintiffs, to support the issue on their part, proved that they and the said defendant, being joint owners of a line of stages on the *Washington* and *Baltimore* road, after various negotiations, entered into the following contract.

" Dear sir,—In answer to your request, I hereby agree to take for my four teams, (say sixteen horses) and two coaches, now running on the *Washington* road, $9,000, and will withdraw all pretensions whatever of my interest on the said road—the payments must be cash, or such paper that will command *cash.* On this being complied with, I will give, from under my hand, not to have any interest in the staging on the said road. I still hold one-sixth of a share in the Steam Boat Company, on the *Potomac* river, as a sett against any claim that has or may hereafter come against me as a proprietor of the said company. This must be taken as my *ultimatum.* I am, dear sir, your obedient servant, *John H. Barney. David Barnum, Esq.*"

"*Baltimore,* 30*th September,* 1825. I hereby acknowledge to have received of Messrs. *David Barnum & Co.* stage proprietors on the *Washington* and *Baltimore* road, $9,000, as a full compensation for the within named four teams and two coaches ; and I bind myself to withdraw all my pretensions to any part of the said road, and I herewith deliver to the said company, the teams as they are at this instant, on the road between this place and *Washington,* and further pledge myself not to be concerned, direct or indirect, in any line of stages in opposition to them. *John H. Barney.*"

And the plaintiffs further offered in evidence, that after such contract was entered into, and before the institution of this suit, that is to say, on the 30th of October, 1825, a line of stages, in opposition to that of the plaintiffs, was set up, and was carried on until the 1st of September, 1827, upon the said road ; and that the stages and horses used on said road, stabled at, and started from the stables of the defendant, and that the drivers of such opposition line of stages, boarded at the house of the defendant, and that every thing was carried on precisely in the same manner, after such opposition line was established and carried on, as before the sale and contract before referred to, in this exception, except that *Mr.*

*Thompson* had the management instead of *B.* He also proved that three stages belonging to the defendant, when witness drove for *Mr. B.*, previous to said contract; four horses and three sets of geers also belonging to the defendant, when witness drove for him previous to said contract, were used upon this opposition line; and also proved that *B.* the defendant, at ·the time one of the witnesses came to drive on this opposition line, was indebted to said witness, and told said *Stephen J. Thompson*, to pay said witness, provided he came and drove for him, *Thompson*—and also proved that *B.* said to a witness when speaking of this line, we want drivers—that such words induced *witness* to ask the defendant if he was concerned, to which he replied no—they also proved that *B.* neither kept a boarding house nor livery stables—and that before the contract before mentioned, the defendant, *B.* ran a team of horses on the *Philadelphia* road, from *Baltimore*, in a line of stages on that road, and that he retained his interest in said *Philadelphia* road, till the fall of 1826, when it was placed in the name of *Stephen J. T;* and also proved that the same horses which run on the *Washington* and *Baltimore* road, in the line of stages in opposition to said plaintiffs, were used to run on the *Philadelphia* road, and in that part of the line belonging to *B.* which was the first ten miles from *Baltimore;* and that the said *Stephen J. T.*, was the son-in-law of *B.* and resided during all this time aforesaid, and for many years before, with said *B.*, and that in the year 1822, the said *Stephen J. T.*, applied for the benefit of the insolvent laws, and in March term, 1823, obtained his final release; since when, until this opposition line was started, he was not engaged in any kind of business, nor has he since been engaged in any other business than as the agent of this line, and as agent for his brother; and the plaintiffs further gave in evidence that the stables which were so rented by the defendant, to the said *Thompson*, for the use of the said opposition line, were situated in the rear of the defendant's

dwelling house, and that the stages of the said line daily passed his door, and that the defendant went to the stage office three or four times in two years, and when there, enquired of the agent of said *Thompson* how they were coming on: and that the stages and horses sold and delivered by the defendant to the plaintiff, independent of their part of the line, were worth not more than $2000: and that whilst the defendant was the avowed owner of a line of stages, he did not come to see the horses once in nine or ten months, trusting to the drivers. The plaintiffs also offered in evidence, that *John V. Thompson*, the brother of *Stephen J. T.*, above mentioned, is, and has been for many years, a resident of the city of *Baltimore*, and that he followed the trade of a journeyman saddler for *several years*, but quitted it *about seven years ago*, because he was short-sighted : the witness said he had no means of knowing the situation of said *Thompson;* that he never had occasion to enquire into his circumstances, and he might have had money without witness knowing any thing about it: witness never considered *John V. Thompson* as a man who would be in credit for a large sum of money; he might have had thousands without his knowing it. Whereupon the defendant, to support the issue on his part, offered in evidence to the jury, by *Stephen J. T.*, that he, the witness, was present when sale was completed, as mentioned in the said contract; that defendant observed that he had not received as much as his property was worth; that if they, the plaintiffs, would permit him still to hold an interest for the residue of the mail contract, which had two years and three months to run, and discharge him from his contract, he would return the money received, which was then in his, defendant's hand, and give them up their note for the balance, and $1000. He then offered to sell to the said plaintiffs, the remainder of his property, consisting of stages, horses and gears. He also offered to rent to the plaintiffs, his stables, one of whom expressed his regret that the stables were not situated nearer him, all which they re-

fused.  Witness commenced to run a line of stages from *Baltimore* to *Washington* about the 30th October, 1825, and purchased of defendant the stages, horses and gears, so offered by him to the plaintiffs, and refused to be taken by them; and also, after sale to the plaintiffs by the defendant, he, *Thompson*, purchased out his, defendant's, team on the *Philadelphia* route, with his interest in the contract on that route upon the last mentioned purchase. Defendant and witness went to *McDonald*, to whom defendant stated that he had sold out on the *Philadelphia* road to witness, who in future would hold the interest in the said line called the *Union* line, *McDonald* being one of the owners of said line.  Witness stated that his brother *John* had enabled him to purchase out the defendant in the first instance, and establish his line of stages to *Washington;* and that his brother *William* was subsequently interested, and furnished the means—he appeared as agent.  That the present defendant never was interested therein, either in establishing said line, or continuing it, and had no concern with the line after witness bought out the defendant; he had two horses remaining, which he kept for his own use through the summer.  Witness applied to him to let him have them during the winter; this application was in the fall, and witness agreed to winter them without any charge for their keeping, as defendant had no use for them in the winter; nothing was said of the kind of use witness should apply them to.  Witness had, at the time, a small carryall and a gig; and drove them sometimes in one, and sometimes in the other: also, in the course of the winter, drove them in the stage on the *Washington* road; this without any express consent of the defendant, who, witness presumes, knew they were so driven, but does not know whether or not—does not know how long driven in the stage, or when first put in; they might have been driven one-third, or one-half the time in the stage; the horses and stages which witness had on the two routes, cost at different times, a little less than $5000. *John V. Thompson,* was

the sole owner until some time about August, 1826, then sold out to *William D. Thompson.* *John V. Thompson* was at the office every day whilst interested; his health did not permit him to do much, but the business was considered under his eye; books kept in witness' name as agent; never received one dollar of defendant; he did not pay defendant for stages and horses purchased; the price was agreed on, and was to be paid when convenient to the witness, he paying interest therefor; the amount not yet paid. Witness considered himself, as agent, and his brother also, responsible to defendant for the property so purchased as before mentioned, and for which he had agreed to give $1050, but he did not consider himself as individually responsible; the amount to be paid when convenient, but to bear interest; which interest was, at different periods, paid to defendant, as well as rent and board; believes interest to have been rather overpaid; no note was given for the amount of purchase; begun to pay to defendant on account of interest, &c. within six months after contract. Witness had sometimes had two or three, sometimes five or six drivers and porters boarding with the defendant; the defendant sold out the *Annapolis* line to *Mitchell,* shortly after his contract with the plaintiffs; when defendant owned stages, one seldom went out without his examining it particularly; since he sold out, have not seen him three times in the stable yard; never once saw him in the stable. Witness, before contract between defendant and plaintiff, told *Smith,* one of the company, and one of the plaintiffs, whose death is suggested, that he, witness, meant to establish a line of stages between *Washington* and *Baltimore;* that he repeated the same thing to *Smith,* on different occasions, and told him if plaintiffs completed their contract with defendant, *he* would not prevent his going on. Upon being asked whether he informed plaintiffs at the time of contract, says he did not at that time; that he had previously done so to *Smith,* and did not think it necessary or proper to repeat it; he presumed them all acquainted with the

fact, and did not think it to his interest, or proper for him to interfere with defendant's contract. Witness mentioned to the defendant, some time before he sold out, that if the plaintiffs run him off the route, and he would permit him to become interested, he would join him. Witness subsequently took the entire possession of a small house belonging to defendant, and near his dwelling; that when he did so he took his drivers to board, and then by agreement with defendant, the sum to be paid him annually for rent of house, stables, shed, and interest, was $1000, being reduced to that sum from $1600. Witness received a bill of the purchase, and gave no note therefor; agreed to give for the rent of stable, board and interest, $1600 per annum. *John V. Thompson* advanced to witness, on account of the line, $4825; this amount placed with witness in September and October, 1825, as occasion required. Witness' brother *John* kept no bank book, that he knows of, nor did he know of his selling any stock, and paid him the $4825 in cash, and not in any instance by a check. Witness agreed to give defendant for the residue of his stages, horses and gears, $1050. Witness also purchased for cash, one stage in *Philadelphia;* never made any dividend; believes there was no profit made; as money was received, it was applied to bearing expenses and buying fresh horses, &c. Witness' brother *John* sold out to his brother *William;* no statement was then exhibited. Witness was to have the benefit derived from the stages. Witness rented of *B.* his stables, which were very large and spacious, and had been built by defendant many years before, for his own accommodation and use, at a heavy expense, when largely interested in stages; and also boarded with him, as he did his drivers, and was to give for the use of the stables, boarding of himself, drivers, infant child and servant, and the interest on the $1050 above mentioned, $1600: and said *B.* had convenient accommodations for boarding drivers; stables and kitchen were in the same yard. The two horses hired from Mr. *B.* being at the expense of wintering them, were returned to

him the March following, on demand by him. Said *Thompson* had become an insolvent debtor in 1822, and when he established the line of stages as aforesaid, he thought it prudent to conceal his interest in the said line, (having before taken counsel) lest he might be embarrassed by his creditors, one of whom was the *United States.* The defendant further offered in evidence by one *Grant,* that he, *Grant,* had lived with defendant for fifteen or twenty years before he sold out to the plaintiffs; that when he sold out, he dismissed witness, who remained out of employment from four to six weeks, except in going at the request of one of the owners of the *Annapolis* line, three times a week during part of that time, to attend the *Annapolis* stage. When *Thompson* commenced, he employed witness; he has since acted as *Thompson's* clerk, and settled with him weekly, or oftener, and paid over proceeds to him; never has known defendant in this matter since he sold out, and never knew or understood that he was concerned; never told *McKean,* or other person, that he, defendant, was concerned formerly, and before defendant sold out to the plaintiffs, he kept tavern, and *Thompson* lived with him, but never interfered with the business of staging; and since he sold out he has interfered and paid particular attention thereto; on the other hand, since the stages have been conducted by *Thompson,* the defendant has never interfered with the business, nor has this witness ever accounted to *him,* or paid over any thing to him, not considering him as having any thing to do therewith, but on the contrary, considering *Thompson* as the person interested therein, and his employer, and who employed him as his clerk, he, *Thompson,* acting as agent of his brother. The witness states that when the defendant was the owner, he was very particular, and constantly examined the stages, &c. before they went out; he has never done so since. Witness, *Thompson,* upon being asked what he meant by using the term interest, when speaking of his not disclosing his intention to establish stages when the contract was signed, says he has no recollection

of using the word; he was not intimate with any of the gentlemen, except *Smith*, and not upon intimate terms with him, and it would therefore be improper; that he did not mean to convey the idea that he had any interest in concealing his intention; he could not have so meant, because he had that very morning, on his return from *Washington*, so informed the said *Smith*. And the said defendant further proved by *Stephen J. Thompson*, that the following bill was rendered to him, said *Thompson*, by defendant: *Mr. S. J. Thompson* to *John H. Barney*.

"March 17, 1827, cash paid *Wm. C. Gent*, for hay, $88 50; April 30, rent of stables, interest and board to this day, $800; July 31, rent of dwelling, stables, &c. &c. three months, ending this day, $250; Oct. 31, rent as above, $250—$1388 50."

1827, January 15 to 1st May, by various items of cash, $537 66: 12th May, 1827, to 17th November, by various items of cash, $665 55.

Due J. H. B. $185 29."

And then proved, that *William C. Gent*, mentioned in the first item of the last account referred to, was largely indebted to the *Levy Court*, and *Mr. B.* was treasurer of that court: that the said *Gent* paid at different times to said *B.* whose duty it was, as treasurer, to settle with him, various sums of money, who opened the account against said *Gent*, and recently closed it, by delivering *Gent's* note to the clerk of the now commissioners of the county, for the balance: and upon the cross examination by the plaintiffs counsel, of *Stephen J. Thompson*, he was required to produce all the quarterly settlements with defendant: he went to his office and returned, and produced the accounts offered in evidence by the defendant, and stated that he had looked for the other accounts: that the one now produced, was the only one he had been able to get—the others were at his house. Whereupon the plaintiffs counsel asked him whether the other accounts were headed in the same manner, to which the witness answered that he believed that

was the only account so headed; that the others, he believed, were all headed *J. Thompson*, agent.

The defendant further offered evidence by *Stephen J. Thompson*, that the settlement made with the parties interested in the *Union* line to *Philadelphia*, for the winter of 1825 and 1826, was made at *Elkton*, between the parties concerned in said stages: that *Samuel McDonald* was not then and there present, and that such settlement was so made, with a recognition of said *Thompson's* interest, as agent, as aforesaid, and not as recognizing in *Mr. B.* an interest in any part of the said line from *Baltimore* to *Philadelphia*: that said Thompson assisted at said settlement, and said *B.* did not so assist. The defendant also proved, that *William Thompson*, brother of *Stephen J. Thompson*, is a rich man, and is doing an active business in the *West Indies*, but is now in the *United States:* and the defendant proved by *George Beltzhoover*, that while there was no opposition, he, as agent, bought of the plaintiffs half a stage and four horses, one in ill health and at the purchaser's risk, and which died before he received him, for the sum of $2,000, which purchase gave him an interest in the line, and with a view to get them to stop at his tavern house. After the defendant closed his case, the plaintiffs called a witness, who proved that being written for by *Grant*, one of the witnesses of the defendant before mentioned, to come and drive for *Thompson*, he called upon said *Grant*, and told him he would not drive for *Thompson*. *Grant* then told him, you know what sort of a gentleman *B.* is; *Thompson* and I are only agents for defendant; that witness then replied he knew what sort of a man *B.* was, and if that were the case, he, the witness, would rather drive for *B.* than any other of the owners, but he doubted whether he would employ him, as witness had sued *B.* And also proved by said witness, that the defendant told *Thompson* to settle with witness, if he would drive for him, *Thompson*. Whereupon the plaintiffs, by their counsel, prayed the Court to direct the jury,

*First.* If the jury shall find from the evidence, that a line of stages from *Baltimore* to *Washington*, was established about the month of October, 1825, in opposition to the line of stages on the said road, then owned by the said plaintiffs, and that the said line of stages, so established in opposition as aforesaid, continued to run in opposition to the aforesaid line of the plaintiffs until the institution of this suit: and if the jury shall also find that the defendant in this cause furnished the owners of the said opposition line with credit, money, horses, or any other means, in order the better to enable the owner or owners of the said opposition line to establish it and carry it on, and by reason of which means, so furnished, the said owners were the better enabled to establish it and carry it on, that then the plaintiffs are entitled to recover, notwithstanding the defendant may not own any of the horses, carriages, or other property employed in said opposition line.

*Second.* That by the contract on which this suit is brought, the defendant was bound not to assist in carrying on any line of stages, in opposition to the plaintiffs, on the road from *Baltimore* to *Washington;* and if the jury find the evidence that he did render assistance of any kind to the owners of a line of stages established on the said road in opposition to that of the plaintiffs, and that such assistance was rendered by him for the purpose of enabling the owners of the said opposition line the better to establish and carry it on; that the rendering of such assistance for such purpose, was a breach of the aforesaid contract, although the defendant may not have owned the aforesaid opposition line, or any part or portion thereof, or of the horses and stages employed thereon. Which directions the Court (ARCHER, Ch. J., HANSON and KELL, A. J.) refused to give, but directed the jury that there was no evidence in this cause to show that the defendant had furnished the opposition line with credit, money, horses, or other means, in order the better to enable the opposition line to carry it on, but that the horses and other means were sold by the

defendant to said opposition line, if the jury believe the testimony in the cause; and that such sale—if the jury believe that the horses and other means were owned and left on hand of defendant, at the time of contract between plaintiff and defendant, was no violation of the contract on the part of the defendant; and furthermore, that the letting *Thompson* have two horses for and in consideration of the wintering of them, to be returned in the spring, if the jury should believe they were occasionally run in the opposition line, was no violation of the contract, unless the jury should believe the said horses were purchased by the defendant with the view of assisting the opposition line, and that defendant let *Thompson* have them for that purpose. Whereupon the plaintiffs excepted.

2d EXCEPTION. The evidence offered in the first bill of exception by plaintiffs and defendant, and which is to form a part of this bill of exception, having been given, the plaintiffs by their counsel prayed the Court to direct the jury upon the following prayers:

*First.* That if the jury find from the evidence that the defendant furnished the owners of the opposition line herein before mentioned, with two horses for the purpose of being used in the said opposition line of stages herein before mentioned, from September, 1825, until the spring following, for which the defendant was to pay nothing but the expenses of keeping them; and also that the defendant furnished the owners of the said opposition line with two other horses, three stages, and three setts of harness for $1050, to be paid for when convenient, to a certain *Stephen J. Thompson*, for whose use and benefit the said opposition line was established; and if the jury also find that these means were furnished by the defendant as above mentioned, for the purpose of assisting in the establishment and support of the said opposition line; and that the said means, so furnished, did the better enable the owners thereof to establish and support the same; that then the plaintiffs are entitled to recover, notwithstanding the defendant was not an owner

or part owner of the said opposition line, or of any part or portion thereof, or of the property employed therein.

*Second.* If the jury believe that *John H. Barney,* the defendant, lent *Stephen J. Thompson* three horses, for the purpose of being used in a line of stages in opposition to the plaintiffs, and which horses were so used, that then the plaintiffs are entitled to recover.

*Third.* If the jury shall believe that *Stephen J. Thompson,* after the 30th September, 1825, and before the institution of this suit, established and carried on a line of stages in opposition to the plaintiffs, and that *John H. Barney,* the defendant, hired to said *Thompson* stables, sold him carriages, horses and harness, for the purpose of being used and employed in such opposition line, then the plaintiffs are entitled to recover.

*Fourth.* If the jury shall find, from the testimony given in the trial of this action, that the defendant before the time of making the contract with the plaintiffs, set forth in the declaration, had been informed and knew at the time of making such contract, that it was the intention of *Stephen J. Thompson* to establish and carry on a line of stages between *Baltimore* and *Washington,* in opposition to the line owned by the plaintiffs on said road, and that the defendant afterwards furnished to the said *Thompson* such a portion of the means, advice and assistance necessary to establish and carry on such opposition line, as he could not otherwise have obtained, or without the aid of which the said *Thompson* could not have effected the establishment and carrying on of such opposition, the defendant knowing and intending that the means, advice and assistance furnished by him, would and should be so used by said *Thompson,* then the plaintiffs are entitled to recover.

*Fifth.* If the jury shall believe from the evidence, that the defendant, in making the sale of his horses, stages and harness to *Stephen J. Thompson,* and contracting with him for the compensation to be paid for the rent of stables and boarding of drivers, to be used in establishing and carrying

on a line of stages on the *Washington* road, in opposition to the plaintiffs, derived any benefit or advantage from the intended aid thereby to be afforded, in effecting the establishment, or of the carrying on of such opposition, then the defendant was concerned in such opposition, contrary to his agreement, and the plaintiffs are entitled to recover. Which several directions the Court refused to give. Whereupon the plaintiffs excepted.

The verdict and judgment being for the defendant, the plaintiffs appealed to this Court.

The cause was argued before BUCHANAN, Ch. J., EARLE, MARTIN and STEPHEN, A. J.

*Meredith* and *Taney*, (Att'y. Gen'l. of Md.) for the appellants, contended, 1. That by the true construction of the agreement before mentioned, if *Barney* furnished the owners of the opposition line with money, credit, horses, or other means, for the purpose of enabling them the better to establish or carry on that line, and that such means did enable them the better to establish or carry on that line, that then he has broken his agreement, and the plaintiffs are entitled to recover. The defendant had no right to interfere in any way with the line of the plaintiffs. The object of the contract was to prevent his being concerned, or assisting in establishing a line of stages on the *Washington* road. Furnishing means or credit for such a purpose, was a violation of the contract. 9 *Massa. Rep.* 522, 524. The word "indirect," was introduced into the contract, to prevent the defendant co-operating with, or affording any assistance to the opposition line. The word "direct," would merely have prevented his having an interest in the line. The contract meant something more than merely to prohibit the defendant from being interested in the stages. The decision in 9 *Massa. Rep.* is applicable to this case. It did not turn upon the pleadings, but upon the contract, and in that case the stipulation was not that the defendant would not be concerned in the trade, but that he would

have no interest in it; yet it was held that fitting out a vessel, though she was sold before she sailed, was a breach. The object was, to get rid of a rival in a limited trade, and here to get rid of one in a much more limited object.   The fact that *Thompson* informed the plaintiff's that he would establish an opposition line, was the reason that induced them to insist on the stipulation restraining defendant.   2. If the Court should be of opinion that the first proposition cannot be maintained, then it is contended that if *Barney* furnished the owners of the opposition line with money, credit, or other means, for the purpose of enabling them *to* establish and carry on that line; and that the said owners could not have established it or carried it on without the means so furnished by *Barney*, that then he has broken his agreement, and the plaintiff is entitled to recover.   3. There was evidence offered on the part of the plaintiffs, *tending to prove* that *Barney* did furnish the owners of the opposition line with means, for the purpose of the better enabling them to establish or carry it on; and that they were thereby the better enabled to establish it and carry it on.   4. That there was evidence offered on the part of the plaintiffs, tending to prove that *Barney* did furnish them with means for the purpose of enabling them to establish and carry on the opposition line.   *McElderry vs. Flannagan,* 1 *Harr. and Gill,* 320.   *Fergusson vs. Tucker,* 2 *Harr. and Gill,* 189.   *Drummond vs. Prestman,* 12 *Wheat.* 515.   1 *Stark. Evid.* 400.   *Mason vs. Harrison & Boggs,* 5 *Harr. and Johns.* 480.

Johnson, and Williams, (District Attorney U. S.) for the appellee, upon the construction of the contract, contended that it was merely a stipulation that *Barney* would have no *interest* in any opposition line, not that he would not sell his horses, &c. to other persons, though he might in so dealing sell to persons engaged in the opposition line.   There is proof that before the contract, that *Thompson* told one of the plaintiffs that he would run an opposition line on the

road, there could not therefore have been any expectation on the part of the plaintiffs, that by buying defendant's interest they would get clear of all opposition, or that defendant's horses, &c. would remain unsold. In construing written contracts, you may look to the situation of the parties. 8 *Massa. Rep.* 214. 18 *Ib.* 332. The case cited from 9 *Massa. Rep.* by our opponents, was a demurrer to the plaintiff's replication, and the facts therein stated and those in the declaration, are admitted, except so far as they are contradicted by the plea. The replication charges that the ship was fitted out by the defendant, whose skilful competition it was the object of the contract to remove. If he had merely sold a vessel on hand at the time of the contract, without a cargo, for such a voyage, then it would be something like the case at bar ; for the direction of the Court is, that if *Barney* merely sold carriages and horses on hand at the time, and known by the plaintiff to be on hand, that was no breach ; a contract not to carry on a particular trade, cannot be broken by selling materials or goods on hand at the time, to any one who proposes to carry on such a trade. 2. Was there any evidence which entitled the plaintiff to recover. The Court do not say that the plaintiffs evidence does not entitle them to recover, but if the evidence on both sides is believed, then they cannot recover. The jury could not find for the plaintiffs, without disbelieving the defendant's proof, it being positive, but they might have found for defendant, without disbelieving the plaintiffs proof, because there was no conflict between the circumstances proved by them, and the *absence of any interest* in the defendant. All the plaintiffs proof must be true, consistently with the defendant's evidence. The plaintiffs proof was but presumptive, and could only be good in the absence of positive proof. If, however, there is a conflict in the proof, the plaintiffs were not excluded from the jury. The direction of the Court left them at liberty to show that *Thompson*, defendant's witness, was not to be believed. They cited 4 *Cranch*, 62. 6 *ib.* 226. 5 *Massa.* 10.

BUCHANAN, Ch. J., delivered the opinion of the Court.

This was an action of trespass on the case, for the alleged violation by the defendant of a contract, or engagement by him, with the appellants, dated at *Baltimore*, the 30th of September, 1825, which is in these terms: "I hereby acknowledge to have received of *Messrs. David Barnum & Co.*, stage proprietors on the *Washington* and *Baltimore* road, $9,000, as a full compensation for the within named four teams and two coaches; and I bind myself to withdraw all my pretensions to any part of the said road, and I herewith deliver to the said company, the teams as they are at this instant on the road between this place and *Washington*, and further pledge myself not to be concerned, direct or indirect, in any line of stages in opposition to them." This is written on the back of a letter from the defendant to one of the appellants, containing proposals of sale, to which it refers by the expressions, "for the within named four teams and coaches."

It appears that an opposition line of stages was very soon afterwards set up: upon which the question arose, whether the circumstances under which that opposition line was set up and carried on, amounted to a violation by the defendant of his contract. A great deal of parol evidence was offered at the trial, on both sides, and the case comes up on two bills of exception, taken to the refusal of the Court to give the instructions prayed for by counsel for the appellants, and to the direction that was given to the jury in reference to the testimony. The direction given to the jury, is in these words: "that there was no evidence in this cause, to show that the defendant had furnished the opposition line with credit, money, horses, or other means, in order the better to enable the owners of the opposition line to carry it on, but that the horses and other means were *sold* by defendant to said opposition line, if the jury believe the testimony in the cause; and that such sale, if the jury believe that the horses and other means were owned and left on the hands of defendant, at the time of the contract between

plaintiffs and defendant, was no violation of the contract on the part of the defendant; and furthermore, that the letting *Thompson* have two horses, for and in consideration of the wintering of them, to be returned in the spring,—if the jury should believe the evidence, although the jury should believe they were occasionally run in the opposition line, was no violation of the contract, unless the jury should believe the said horses were purchased by defendant, with the view of assisting the opposition line, and that defendant let *Thompson* have them for that purpose." This involves the construction of the contract, and also the question whether the direction of the Court amounted to an invasion of the province of the jury. The whole of the evidence being set out in the first bill of exception, it is unnecessary here to state it particularly.

In construing this contract, we must endeavor to arrive at the meaning of the parties, by looking to the motives that led to it, and the object intended to be effected by it. The motive, then, of the appellants, who were stage proprietors on the *Washington* and *Baltimore* road, was manifestly to become sole proprietors of all the stages on that road, and to shut out all opposition; and to effect that object, the purchase of the interest of the defendant, in a line of stages then running on the same road, was made. And it cannot be believed, that with such an object in view, they would have made the purchase with any other understanding than that the defendant should, in good faith, not only not become interested in any opposition line, but that he would not in any manner aid or become instrumental in the setting up or carrying on an opposition line. If that was not the understanding and intention, the purchase was a very wild and unmeaning one, as there were many ways in which the defendant, without being concerned in interest, might be concerned or engaged in promoting and encouraging the setting up and carrying on an opposition line, to their prejudice, and to the total loss of the amount given for the immediate interest bought out. The purchase was

not made for the purpose of throwing away, or giving to the defendant, $9,000, which would be the effect if he was at liberty and disposed so to act, immediately to lend his aid and patronage to the establishment of an opposition. But it was made for the purpose of shutting out all opposition, and securing to themselves the exclusive advantages of the road, so far at least as related in any manner to the defendant; to effect which object the concluding stipulation, "and further pledge myself not to be concerned, direct or indirect, in any line of stages in opposition to them," would seem to have been introduced.   The word *indirect* seems to us to have been used for the special purpose of guarding against any kind of interference by the defendant, in aiding or in any manner promoting, the establishment of, or carrying on, any opposition.   Our construction therefore of the contract is, that the defendant could not, without violating the contract, set up or carry on, or knowingly aid or intermeddle, or in any way whatsoever, directly or indirectly, be concerned in setting up or carrying on any line of stages on that road, in opposition to the appellants; he was bought out for the purpose of being put entirely out of their way. Under any other construction, the word *indirect* would lose its office, and the object of the contract be defeated.   Suppose the defendant immediately after the contract, had given all the horses and stages he owned to a son, for the express purpose of setting up an opposition line to the appellants, or (under feelings of resentment for some cause or other) to a stranger, for the same purpose, and with a view of injuring the appellants, or had given a premium to any one to set up such a line of opposition, can it be doubted that in either case he would have broken his contract.   He had the same right to sell any horses or stages that he owned at the time of the contract, that he had to sell any other property to whom he pleased,.without intending that they should, or knowing that they were to be put to the purpose of setting up a line of opposition stages.   But he could not have sold them to any person, for the express purpose of

being so used, without violating his contract; nor had he under his contract any right to loan or hire any of his horses to the owners of the opposition line, for the purpose of being used on such line. And in the case of his hiring or lending any of his horses to the owners of the opposition line, for the purpose of being used on such line, we do not perceive that it would make any difference whether they had belonged to him before, or whether they were purchased by him for that purpose, the breach of the contract consisting in his assisting the opposition line by letting the owners have them for that purpose.

It is our opinion, therefore, that if the defendant did furnish the owners of the opposition line with money, credit, or other means, for the purpose of enabling them to establish and carry on that line; and that the means so furnished, did enable them to establish and carry it on; and that they could not have established or carried it on without such means, so furnished by the defendant; or that he did furnish them with money, credit, horses, or any other means, for the purpose of enabling them the better to establish or carry on that line; and that such means did enable them the better to establish or carry it on, the appellants were entitled to recover, and that there was legal and competent evidence in the cause, tending to prove either of those propositions, which ought to have been submitted to the jury for their decision upon its effect. The general rule being, that where there is any legal admissible evidence, tending to prove the issue, the effect of that evidence is solely for the consideration of the jury. Though we have said the testimony taken at the trial, ought to have been left to the jury, as tending to prove the issue on the part of the appellants, we wish to be distinctly understood as intending to express no opinion touching the effect of that evidence, further than that it was fit to be left to the jury for their consideration, to pass for whatever it was worth, and have therefore intentionally avoided commenting on any part of it, to show in what it tended to prove the issue, or any

material fact in the cause. There seems to be an impression at the bar, that this Court has held the measure and quantity of proof to be a question of law, and the case of *Davis vs. Davis, et al.* 7 *Harr. and Johns.* 36, is commonly relied upon in support of that doctrine. We by no means mean to shake the authority of that case, but think it has been misunderstood. When there is no evidence applicable to the issue, or tending to prove any material fact, a total failure of evidence, the Court will direct the jury accordingly; and that we conceive to be the doctrine of *Davis vs. Davis, et al.* The expressions used, are intended to be applicable to the facts of that case; and so applied, they are not, we apprehend, opposed to the principle here asserted, that if there be any evidence tending to the proof of the issue, however weak, it ought to be submitted to the consideration of the jury. Under this view of the subject, we dissent from the opinion of the Court below, on both bills of exception, and we think the direction of the Court, that there was no evidence in the cause to show that the defendant had furnished the opposition line with credit, money, horses, or other means, in order the better to enable the owners of that line to carry it on, was an invasion of the province of the jury, to whom that question ought, upon the evidence, to have been left.

JUDGMENT REVERSED, AND PROCEDENDO AWARDED.