# SPANISH AMERICAN CORK & SPECIALTY CO.

## *vs.*

## THE STATE, Use of Louise Schneider, Widow.

### *Prayers: no evidence; effect of—; duty of courts.*

A prayer seeking to take a case from the jury on the ground of total failure of evidence to support the plaintiff's case will not be granted if there is any evidence, however slight, legally sufficient as tending to prove it.                     p. 608

In passing upon such a prayer, the court assumes the truth of all the evidence before the jury tending to sustain the claim or defense, as the case may be, and all the inferences of fact fairly deducible from it, although such evidence be contradicted in every particular by opposing evidence in the cause.     p. 609

*Decided June 25th, 1919.*

Appeal from the Court of Common Pleas of Baltimore City. (GORTER, J.)

The facts are stated in the opinion of the Court.

The cause was argued before BOYD, C. J., BRISCOE, BURKE, PATTISON, URNER and ADKINS, JJ.

*Warner Paine* and *Edgar Allan Poe* (with *Bartlett, Poe & Claggett* on the brief), for the appellant.

*J. Cookman Boyd,* for the appellee.

PATTISON, J., delivered the opinion of the Court.

The appellee, the widow of William Schneider, brought suit against the appellant, the Spanish American Cork & Specialty Co., in the Court of Common Pleas of Baltimore City, to recover damages for the death of her husband, resulting, as alleged, from the negligence of the defendant company.

William Schneider was, on the 27th day of November, 1916, an employee of Eugene I. Rosenfeld & Co., a corporation, engaged in the electrical business in the City of Baltimore. The defendant, at such time, was engaged in the business of grinding cork at No. 2211 Pennsylvania avenue in said city.

On the said 27th day of November, 1916, Schneider, at the request of the defendant, was sent by his employers to defendant's place of business to remove an old motor and to install a new one to be used in running a machine for grinding cork. The motor was placed in its position upon the third floor of defendant's building and the current was turned on, but it was found that the power was not sufficient to run the machine with the rapidity required of it.

After attempting and failing to locate the trouble upon the third floor, he went to the first floor and then to the cellar in search of it. In descending to the cellar, he passed through a trap-door, which he left open as we gather from the record, although the evidence is somewhat contradictory as to such fact. He was in the cellar but a short while when those upon the first floor, or at least some of them, heard what they described as an explosion which was accompanied by smoke and flames arising from the cellar through the open door. This, they say, was followed by a second explosion, with a puff of smoke and flame. In a very short time thereafter, Schneider was seen coming up from the cellar through said door. He was cared for and subsequently sent to the hospital, where he died about 12 o'clock that night, from the burns sustained by him.

The first count of the declaration alleges, that the "defendant in default of its duty in the premises, did not furnish and provide for its agents and servants, or for the agents and servants of independent contractors rightfully upon said premises and in and about the business of the defendant, a reasonably safe and proper place in which to work, and did expose them to unnecessary risk and danger so that heretofore, to wit, on or about the 27th day of November, 1916, William Schneider * * * died because of burns received as a result of an explosion of inflammable cork-dust, a dangerous substance which was negligently permitted by the defendant to be collected and confined in defendant's factory in which the deceased, with the knowledge and at the request of the defendant, was engaged in doing some electrical work for and on account of the defendant; and the plaintiff says that the death of said deceased was directely caused by the act, neglect and default of the defendant in the premises, * * * in failing to provide a reasonable safe and proper place in which to do the work aforesaid, and in failing to warn him of the danger in working in said place, although the same was known to the defendant, and not known to the said William Schneider."

The second count of the declaration, after alleging negligence on the part of the defendant in permitting inflammable and explosive cork-dust to accumulate in the cellar of the building, which was alleged therein to be unsafe and dangerous to persons who might be lawfully in said basement or cellar, alleged that William Schneider,

"an electrician, employed and engaged in doing some electrical work in and about the premises of the defendant (which said work was being done at the invitation of the defendant and at its request), whilst working in said basement or cellar for the purpose of adjusting a fuse box, having been admitted thereto by the express permission and invitation of the defendant in and about the business and work of the defendant, and

in pursuance of the instructions and orders of the defendant, its agents and servants; being ignorant of the dangerous condition caused by the accumulation of the inflammable and explosive cork-dust under the conditions existing in said cellar, and not having been warned by the defendant to guard against said dangerous condition, although said cork-dust had been caused by the defendant to accumulate so that it permeated and filled the entire cellar and was in that portion through which the said William Schneider had to pass in order to perform his work, of which said conditions the defendant was fully aware and of which said defendant failed to warn the deceased, and the plaintiff says that whilst the said deceased was engaged in adjusting said fuse box located in said cellar, and whilst in the exercise of due care, there was a sudden explosion and combustion of said highly inflammable and combustible cork-dust in said cellar, and the said William Schneider was seriously burned and injured."

To this declaration the defendant pleaded the general issue plea. The trial of the case resulted in a verdict and judgment for the plaintiff. It is from that judgment this appeal is taken.

The only exception found in the record is to the ruling of the Court in its refusal to grant the defendant's prayer in which it was asked to instruct the jury that the plaintiff had offered no evidence legally sufficient to entitle it to recover, and that the jury be directed to find for the defendant.

The rule to be applied in determining whether evidence in support of the plaintiff's case is legally sufficient to be considered by the jury is now well established in this State by the many decisions of this Court.

A prayer seeking to take the case from the jury on the alleged ground of the total failure of evidence to support the plaintiff's case, will not be granted, if there is any evidence, however slight, legally sufficient as tending to prove it, that is to say, competent, pertinent, and coming from a legal

source; or otherwise stated, a case will not be taken from the jury upon a prayer that there is no sufficient evidence to justify the finding for the adverse party, if there be any evidence from which a rational conclusion may be drawn as opposed to the theory of such a prayer; and in considering such evidence, the Court must assume the truth of all the evidence before the jury tending to sustain the claim or defense, as the case may be, and of all inferences of fact fairly deducible from it; and this, though, such evidence be contradicted in every particular by the opposing evidence in the cause. *Davis* v. *Barney,* 2 G. & J. 382; *Maltby* v. *N. W. Va. R. R. Co.,* 16 Md. 422; *Wetherall* v. *Garrett,* 28 Md. 450; *Wetherall* v. *Claggett,* 28 Md. 465; *Lyon* v. *George,* 44 Md. 295; *Odend'hal* v. *Devlin,* 48 Md. 439; *Fairfax Forest Co.* v. *Chambers,* 75 Md. 604; *Poe's Practice,* sec. 295a; *Jones* v. *Jones,* 45 Md. 144; *Balto. Elevator Co.* v. *Neal,* 65 Md. 459; *Moyer* v. *Justis,* 112 Md. 220; *Balto.* v. *Leonard,* 129 Md. 621, and many others.

Therefore, in determining whether the evidence offered in this case, in support of the plaintiff's claim, was legally sufficient to go to the jury, we must first assume the truthfulness of such evidence although it be positively contradicted by the opposing evidence found in the record.

Robert Wills, an employee of the defendant company at the time of the accident, testified that Schneider came to the defendant's place of business to install the motor, arriving there between 10 and 11 o'clock on the day of the accident. Schneider was not only to install the new motor but he was also to take down the old motor. To do this he asked witness and other employees of the defendant who were present to help him. This they did, and when the new motor was installed in its position upon the third floor, he tried to start it. "It ran, but not satisfactorily." Schneider said, "that is funny," and stated that he was going downstairs to see what the trouble was. He went to the first floor and said to Mayol, who it seems was at least in partial charge of the

plant in the absence of the president and manager, Casino Benajan, "I would like to have a fuse." Witness at the time was standing nearby, and Mayol said, "I don't know what you mean," and Schneider then asked him if he had a candle. Mayol replied, "Yes, I can get you a small candle," and Schneider after getting the candle asked him, "where is the cellar door," and Mayol said, "there is the cellar door, right here." He also asked him where the fuse box was located. Schneider with witness then went to the cellar through the door pointed out to him by Mayol, and in going down the steps, witness turned on the electric light that was attached to one of the "rafters" in the cellar. He then showed Schneider the fuse box upon the front wall of the cellar, which was "near the coal hole with a grate over it," and then asked Schneider if he needed him further and Schneider said, "no, not just now." It was then about one minute of twelve o'clock. He then returned to the first floor and there found Knipple and Deavers about to eat their dinner. He left them and went to his home, two doors away, to get his dinner, but before going there, Knipple and Deavers suggested to him that he had "better call the electrician up for dinner." He did so, and Schneider said, "all right, I will be up in a few minutes." Witness then went to his home and when he got back the accident had happened.

Upon cross-examination he said he went down the steps of the cellar ahead of Schneider and it was then about five minutes of twelve o'clock.

William Deavers, an employee of the defendant, testified that he helped Schneider to remove the old motor and to install the new one, that the new motor when started seemed not to run fast enough. It was then quarter to twelve o'clock. Witness then went to the first floor and from there to the cellar to get a bucket of coal, and as he came out of the cellar, Schneider and Wills "were on the first floor just about to go into the cellar to see about the fuses, and I heard him ask Mr. Mayol about the fuses in the cellar, and Mayol said, 'me

know no' about the fuses. Bob Wills took Mr. Schneider down into the cellar and stayed awhile and Bob came up, that was about a minute of twelve, when I said, 'Bob, call the electrician up, it is dinner time,' and he said, 'I told him it was dinner time, and he said all right I will be up in a few minutes.' So Bob went on to dinner, and I went * * * over alongside of the boiler where it was warm to eat dinner and George Knipple he started towards me with a little bit of coffee in a tin cup, and I said 'we're going to drink a little coffee today,' and he did not have time to answer me because it sounded as though the cellar door had blown open and a puff came up and then it sounded like another explosion and flames shot up. I hollered to George, there is girls in the front, try to get them out. We were all excited, we could not get past the cellar door, and he and I hollered to the girls and we ran out the back." They went out a side alley between two houses and around to the front door of the defendant building, and "just as we got there, Mr. Schneider was coming out the door." He was then asked: "Q. Did you have occasion to observe his condition when he came through the front door? A. Yes, sir; he was burned all over. His sweater was practically burned off him, and his hair—well, you could hardly tell him from colored fellow. I did not know him, when I first seen him." Witness also stated that "Mr. Mayol was running the place at the time for Mr. Benajan; he was in New York at the time, and he was a kind of assistant to Mr. Benajan."

George Knipple, also an employee of the defendant company, testified that he helped in getting the new motor in its position on the third floor. His work at the time was on the third floor. After the new motor was installed, he saw Schneider start the motor. "It ran, but not fast enough." He then stated that Mayol ordered it to be started up, "and the electrician said the motor was not pulling fast enough and did not have enough current." The witness, after remaining there a few minutes, went downstairs to the first

floor, when presently Schneider came down and stood back of his machine. · Mayol was at the time working nearby on his tool-bench about five or six feet from him. Schneider remained there a few minutes and started to the cellar with Wills. "It was about ten minutes of twelve when I happened to glance around and see him going to the cellar. He had a test lamp—I do not know what it was, but it had two wires sticking out of his hip pocket. * * * About two minutes thereafter, I went to eat dinner. * * * I had no more than sat down when there was a roar like something busted and I jumped up and there was a flame came up and went down, and then another one came up and ran across the ceiling." As he could not get by the cellar door to the front of the building, he went out the back way and around to the front door of the building, as described by the previous witness Deavers, and met Schneider as he was coming out of the building. "Foam was coming out of his mouth and his eyeballs were sticking out and he did not have any hair at all and his skin was like as if you rubbed your skin up against a board." Witness stated it was about ten minutes from the time he saw Schneider go down into the cellar, to the time when he heard the report and saw the flames burst through the cellar door.

Dr. Rumsey, who attended Schneider while at the hospital, testified he saw him about 1 o'clock on the day of the accident. At that time he was unconscious. He stated that Schneider was very severely burned over more than two-thirds of the surface of the body. His mouth and throat were very badly burned, and he further stated that he died of said burns within twenty-four hours after being carried to the hospital. The report made at the hospital stated the injuries to be "face, neck and arms, forearms, hands, finger nails of the left hand burned off, back of thighs, particularly left thigh; buttocks, particularly left buttocks, and mucous membrane of the mouth and throat burned."

The record shows that the machines that ground the cork were operated upon the third floor of defendant's building; that the small particles of cork and cork-dust resulting from the grinding was by means of fans forced through a chute that extended to the cellar below. To the end of the chute in the cellar was attached or hung a bag to receive the material passing through the chute. When the bag was filled, it was taken from the chute and the mouth of it sewed up and the bag with its contents stored in the cellar, where it was allowed to remain until a quantity of it had accumulated, when it was disposed of. It took days to fill one of these bags and at times a bag was not removed when full. At such times, the cork-dust would fall on the floor of the cellar, moreover, the very fine dust, by reason of the current passing through the chute created by the fans above, would pass through the burlap bag and settle in the cellar. The cellar, it seems, was cleared when the shipments of dust were made, but these were not made at regular intervals, and consequently at times there was much of this material in the cellar, not only the ground particles of cork in the bags, but the fine dust that had accumulated upon the floor, walls and ceiling of the cellar. A number of the witnesses offered by the plaintiff testified that at times the dust upon the floor of the cellar was knee-deep. It is true that witnesses offered by the defendant stated that the amount of dust in the cellar was much less, but as we have said, we must assume the truthfulness of the plaintiff's evidence, in passing upon the question before us.

Wills, who accompanied Schneider to the cellar, in speaking of the dust on the day of the accident, said it was knee-deep upon the floor. At that time the fans had not been running since Saturday before the accident on Monday, and there was not so much moving dust in the cellar, but when he and Schneider walked through it to reach the fuse, it arose from the floor and made it more or less difficult to see in the cellar

on account of it, and when he came out, after being there only a few minutes, he had to brush his clothes because of it.

It was shown by a number of witnesses that the dust was very inflammable and when ignited would explode.

Dr. Wm. B. D. Penniman and Mr. Norbert LaPorte, well known chemists of this State, both testified as to the inflammable character of the cork-dust. The former was asked: "Q. Will you tell the gentlemen of the jury your opinion, from your observations, experiments, and study of the inflammability of cork-dust? A. Cork-dust will ignite, just as wood will ignite, readily—very readily indeed, at the temperature of the ordinary flame. In fact, it will ignite at a temperature below that indicated by the ordinary glowing flame, such as of a candle or match. The area of ignition, of course, will be increased by the temperature of the flame, but the temperature of ignition is low, and the rate of burning, if it is distributed with the proper air supply, is rapid." He was then asked: "Q. Dr., you have been in Court during the trial of this case? A. Yes. Q. Did you hear the question to the witnesses on the stand yesterday with reference to the condition of the cellar at No. 2211 Pennsylvania avenue? A. Yes, sir. Q. Tell the gentlemen of the jury whether or not, assuming the truth of the testimony with reference to that subject, whether it was a safe place in which to have a light *such as a light from a candle or an electric spark?* A. It was an extremely unsafe place."

Mr. LaPorte was asked: "Q. You have been in Court all during the trial of this case, haven't you? A. Yes. Q. And you have heard all the testimony in the case? A. Yes, sir. Q. You have heard the testimony with reference to the condition of this cellar on the day and at the time Schneider went down into it? A. Yes, sir. Q. Will you tell the jury whether or not, in your opinion, that cellar, in that condition, was reasonably safe for one to do the work in that Schneider went there to do? A. In my opinion, it was not. Q. Mr. LaPorte, what, in your opinion, would be the effect of a

flame of a lighted candle or an electric spark coming in contact with the atmosphere in that cellar, under the conditions that have been testified to? A. There would be an immediate ignition."

J. Roland Stolzenbach testified that he went to the place of the accident within an hour or so thereafter and saw and talked with a man, who is shown by the evidence to have been Mr. Fisher. "He was the only man in the office except several young fellows standing around him, workmen, I would say they were." Fisher, when asked by him, to describe what had occurred, speaking of the condition of the cellar said, "that stuff down there is worse than gasoline."

Knipple, speaking of Fisher said that he gave orders when Mr. Benajan was away. "He told the girls upstairs what to do and he told us all what to do and when I wanted to know anything, I went to him and he told me what to do."

Deavers testified that Mr. Fisher was "bookkeeper, cashier,—and well, I could not say, but something like general manager in Mr. Benajan's place; he would give orders to Mr. Mayol and Mr. Mayol would take his orders and tell the workmen to do." He was in charge in Mr. Benajan's absence.

Upon cross-examination, he said that he knew Mr. Fisher was the bookkeeper "and I took orders from Mr. Fisher when Mr. Benajan was there." "Q. What orders did you take from Mr. Fisher? A. Well, he would come down and tell you different things to do. Q. Tell you what, tell you that it was time to go out and get something to eat? A. Tell you to go to get dinner, for one thing, or to come down and look at the cork, or tell you to regulate the machine, or things like that."

Henry M. Kluge, who finished the work that was undertaken by Schneider, said that when he went to the defendant's place of business to complete said work, he was told by Fisher that "there was not much of a fire, and they would like to get going as quick as possible." When he had con-

cluded his work he made his report to Fisher and he seemed to be the man in charge.

The cellar referred to was thirty-five feet long and twenty feet wide. The fuse box, as we have said, was attached to the front wall of the building and below it and on the same wall was an electric service box. Parts of the cellar had been deepened and in doing so the earth was not removed from the cellar, but was thrown up against the front wall, causing the depth of the cellar at that point, where the fuse was located, to be about three feet. This condition made it more difficult to reach the fuse box. Other parts of the cellar were said to be about 6 feet in depth. It was entered through a trapdoor, of which we have already spoken, near the rear, opening upon a flight of steps. In the ceiling of the cellar, near the steps, was the electric light, which was turned on by Wills when he went to the cellar with Schneider. The only other source of light or air was a small opening in the pavement covered by an iron grating through which coal or wood was sent down into the cellar.

The appellant claims that the testimony fails to establish any legal liability on its part, for the following reasons: First, because it does not appear from the evidence just what caused the death of William Schneider. Second, because the evidence fails to establish negligence on the part of the appellant, causing the death of William Schneider. Third, because the evidence of the appellant establishes negligence on the part of William Schneider, contributing to his death.

As to the first of the reasons mentioned, it is conclusively shown from the evidence that there was not only an ignition of some inflammable substance in the cellar, but that there was also an explosion.

It is conceded by the appellant there was an actual fire, which was extinguished by the fire department of the city, although only slight structural damage resulted therefrom; and that Schneider died as a result of the burns sustained by him; but it is suggested by the appellant that his injuries

might have been caused by an electric current or by fire or both.

It is difficult to conceive how the injuries or burns, described by the doctor and by the hospital's report could have resulted from an electric current alone. It will be recalled that the doctor stated that more than two-thirds of the entire surface of the body was burned, including the membrane of his mouth and throat. It was attempted by the appellant to show that the burns of the mouth and throat might have been caused by a flame created by an electric spark alone, but this we think was highly improbable from the testimony offered.

Schneider went into the cellar to examine the fuse box located therein and with him he carried a test lamp, pliers and a candle. The purpose of carrying the candle was to light the cellar, if needed in order to see how to make such examinations. The test lamp was to be used for an entirely different purpose. With it he was to make the examination.

There is evidence in the record to the effect that the use of either, owing to the condition of the cellar, of which Schneider had no knowledge, subjected him to risk and danger unknown to him. The candle, Wills says, was not lighted while he was there, and it may not have been lighted at all, but if not lighted, he, nevertheless, was subjected to danger and risk in the use of the test lamp, and although no one is able to say that he used it, or to say, with exactness, what was done by him while in the cellar, nevertheless, we think the known facts, disclosed by the record, that he went into the cellar carrying with him the test lamp and the candle for the purposes stated, and that the ignition and explosion thereafter followed, with the effect upon Schneider as disclosed by the burns sustained by him, were sufficient to go to the jury, as reflecting upon the question as to how he met his death, especially in view of the fact that there is no other plausible theory suggested by which such injuries could have been sustained. It was known to Mayol, one in authority, that he was going into the cellar to make the examination of the fuse

box, and that he had with him his test lamp, and it was from Mayol that he obtained the candle to be carried by him into the cellar, and it must have been known to Mayol that his object in carrying it was to light it, if need be, for the purpose of making the examination.

The evidence also discloses that the dangerous condition of the cellar was known to those in authority, for Fisher, in speaking of it said, "that stuff down there," that is, the material in the cellar, "is worse than gasoline"; and yet Schneider was not warned of the danger that confronted him. This, we think, was negligence on the part of the defendant company.

As to the contributory negligence of Schneider, the evidence, in respect thereto, is not of such a character as to enable us to say as a matter of law that Schneider was guilty of contributory negligence, depriving the plaintiff of the right to recover.

Without expressing our views as to whether the evidence, when considered with the other evidence in the case, was sufficient to entitle the plaintiff to recover, we are of the opinion that the evidence offered was, at least, sufficient to be considered by the jury in arriving at their verdict.

We will, therefore, affirm the judgment of the Court below.

*Judgment affirmed, with costs.*